# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 15, 2012 Session

## STATE OF TENNESSEE v. HERBERT MICHAEL MERRITT

**Direct Appeal from the Criminal Court for Knox County**
**No. 91370     Mary Beth Leibowitz, Judge**

---

**No. E2011-01348-CCA-R3-CD - Filed March 22, 2013**

---

A Knox County Grand Jury returned an indictment against Defendant, Herbert Michael Merritt, charging him with premeditated first degree murder and employing a firearm during a dangerous felony. Following a jury trial, Defendant was convicted of first degree murder, and the State dismissed the firearm charge.  Defendant was sentenced to life imprisonment. On appeal, Defendant argues that the trial court erred in excluding reports by Dr. Murray concerning Defendant's "ability to form specific intent."  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, Jr., JJ., joined.

A. Philip Lomonaco, and John S. Young, III, Knoxville, Tennessee, for the appellant, Herbert Michael Merritt.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; Leslie Nassios and Kyle Hixson, Assistant District Attorneys General; for the Appellee, the State of Tennessee.

## OPINION

### I. Background

Douglas Statzer testified that on the night of June 18, 2008, he was shooting pool at the Friends Sports Bar and Deli (Friends Bar) located on Maynardville Highway in Knox County.  He said that Defendant, Herbert Merritt, a.k.a. "Mad Max," walked up and hugged

him. Mr. Statzer then whispered to Defendant, "Mike, you know you're not supposed to be in here. There's going to be trouble." Defendant responded with profanity and demanded a beer. Mr. Statzer "mouthed" to the bartender, Julie Allen, to give Defendant a beer. Ms. Allen responded by mouthing, "He's barred." Mr. Statzer testified that things began to escalate, and "a few people started shouting things." Defendant again demanded a beer, and the victim, Tony Ford, approached Defendant with "his palms raised up" and asked Defendant to leave the bar before trouble began. Mr. Statzer testified that Defendant then pulled a silver pistol from his jacket, pointed it at the victim, and said, "'Are you going to f-cking make me leave?' or something to that effect." Defendant then shot the victim and turned around to Mr. Statzer and said, "What don't they understand here? I want a f-cking beer, and I want a f-cking beer right now or I'll shoot your little bitch friend behind the bar." Mr. Statzer testified that Defendant was referring to Ms. Allen. Defendant then fired a couple of shots into the ceiling and said, "Does anybody else want to try to stop me from having a f-cking beer?" Mr. Statzer testified that everyone began running out of the bar, and he got a beer from Ms. Allen, who was still at the end of the bar, and gave it to Defendant. Defendant said, "It's about time I got a f-cking beer," and he walked out of the bar.

Mr. Statzer ran over to check on the victim. He raised the victim's head, and "blood was gurgling out of his mouth." Mr. Statzer attempted CPR on the victim, but each time that he cleared the victim's throat, "blood just kept gurgling out." Someone then tapped him on the shoulder and said that Defendant was coming back inside. Mr. Statzer said that Defendant walked back in the bar with a pump shotgun and demanded to know why he was with the victim. When Mr. Statzer told Defendant that he was trying to help the victim, Defendant responded, "Do you want to go lying there next to him?" Mr. Statzer got up, and Defendant shoved him in the back toward the rear entrance of the bar. As they approached the bathrooms in the back hallway of the bar, Defendant asked Mr. Statzer for some cocaine. When Mr. Statzer said that he did not have any cocaine, Defendant fired the shotgun into the ceiling. Mr. Statzer then offered to get Defendant some cocaine. Defendant said that if Mr. Statzer did not return with the drug, ". . . I'm going to track you and your little bitch friend down. . . ." Mr. Statzer left out the back door and ran behind a building "where everybody else was congregating then on the other side of the street."

Gloria Jacobs, an employee of Friends Bar, testified that she was at the bar on June 18, 2008, but she was not working at the time. She was sitting at the bar between the victim and Mark Brady when she saw Defendant, whom she had known for a couple of years, walk in. The bartender, Julie Allen, said, "Mike - Mad Max come - is in here." Ms. Jacobs than asked Ms. Allen, "Do you want me to ask him to leave or are you going to do it?" Ms. Allen was busy and said, "You do it." Ms. Jacobs noted that Defendant had been "barred" from the establishment because he had pulled a knife and that his name was on a list of individuals who had been banned from the bar. She had asked Defendant to leave the bar in the past, and

he had complied. Ms. Jacobs walked up to Defendant and said, "Mad Max, you know you're not supposed to be in here." Defendant appeared angry and responded, "F-ck you, I want a beer." Ms. Jacobs told Defendant that he could not have a beer and that he needed to leave. Defendant then continued his demand for a beer and said that he was not leaving. He also said, "Call the law" several times. Ms. Allen also told Defendant that it was too crowded in the bar and that he would need to speak with the bar owners before he was allowed to stay. Ms. Allen testified that "people started coming around, and it was just chaos." She said that Defendant began cussing and yelling.

Ms. Jacobs testified that the victim walked up, stood to her left, and said to Defendant, "She asked you to leave." A couple of other individuals, including William Radcliff, stood to the left of the victim. Ms. Jacobs testified: "And [Defendant] threw his coat off on the pool table and pulled a gun out and shot [the victim]." She said that the victim was calm when he asked Defendant to leave. Ms. Allen testified that the victim put his hands up and stepped back when Defendant pulled the gun out. She then ducked behind the bar. After Defendant shot the victim, Ms. Jacobs grabbed someone's cell phone from a table and dialed 9-1-1. She then ran out the front door. While she was outside, Ms. Jacobs saw Defendant exit the bar and walk toward a white van. He then opened the door, took a shotgun out of the van, and walked back toward the bar. Ms. Jacobs thought Defendant was coming after her, so she ran to a nearby Pilot gas station.

Julie Allen testified that after Defendant shot the victim, she got a beer for Defendant and gave it to Mr. Statzer. Mr. Statzer then told her, "You get out of here. Run." She then ran out the back door and to a gas station.

Tina Ellison, an employee of Friends Bar, was at home on June 18, 2008, when she received a call indicating that there had been a shooting at the bar. Ms. Ellison then called the bar to make sure that Julie Allen was not in there. Defendant answered the phone and told her that he shot the victim. Ms. Ellison asked Defendant why he shot the victim, and Defendant said, "I was mad." He indicated that he was mad at his girlfriend, and they had gotten into an argument over a tattoo. She testified she was told by Defendant that,

> He went home and he collected a couple of guns. Then he went up to the bar to have a beer. And they asked him to leave. And he got mad. And [the victim] stood up to ask him to leave, and that's when he shot him.
>
> And he told me he was very sorry. He was very sorry. He - he was very sorry. He had gone too far.

And I asked him to drag [the victim] to the door so he'd get some help. And he told me it was too late.

Defendant told Ms. Ellison that he was trying to cut the victim's heart out, but his knife was not strong enough. Defendant asked Ms. Ellison to call his family, and he gave her a telephone number. Ms. Ellison called Defendant's family because she thought they could help get the victim out of the bar. She testified that Defendant did not sound intoxicated when she spoke to him, and his speech was not slurred. She said, "He knew where he was at. He knew what he was doing."

Captain Jeff Palmer of the Knox County Sheriff's Office, a member of the Critical Incident Response Team, responded to the shooting at Friends Bar. He was briefed by other officers and learned that there had been a shooting, and the suspect was barricaded in the bar with someone who was injured or possibly deceased. Captain Palmer and other officers began interviewing the bar patrons to determine the suspect's identity. He determined that Defendant was in the bar, and Captain Palmer began calling Defendant's cell phone. Captain Palmer spoke with Defendant who was initially belligerent and non-cooperative. However, through several "stop-and-go conversations" they were able to make progress. Captain Palmer recorded the conversations, and he called the bar phone once when he lost communication with Defendant. He thought that he spoke with Defendant for a total time of one and one-half hours.

Captain Palmer described Defendant as "mush-mouthed" on the phone and difficult to understand. However, he said that Defendant was lucid and very analytical. Captain Palmer testified that Defendant was very concerned with his safety and welfare, and "he was nearly obsessed with the threat that the SWAT Team posed to his safety." Captain Palmer testified that Defendant also threatened his safety and the safety of the other officers. He appeared to understand the questions asked by Captain Palmer, and he responded to the questions in a rational manner. Defendant was also engaged in negotiations.

Captain Palmer testified that Defendant appeared to be coming out to surrender at one point. However, before Captain Palmer was able to get there, "a SWAT Team member had - had challenged him and just told him to - to show his hands. And he retreated back into the bar." Defendant was agitated over the incident; however, Captain Palmer persuaded him to come out again. Defendant walked out of the bar carrying a pistol, and he laid it down next to him and sat down on the curb. Captain Palmer then advised Defendant to separate himself from the weapon, and Defendant picked up the gun and carried it to a nearby vehicle and placed it underneath the vehicle. Defendant walked back to the curb and sat down where he was taken into custody by members of the SWAT Team.

-4-

Defendant was later interviewed on June 19, 2008, by Detective Heather Reyda and Detective Ray Treece of the Knoxville Sheriff's Office, Major Crimes Division. Detective Reyda testified that Defendant was very calm and polite; however, [h]is appearance was very disheveled," and he appeared to be intoxicated. Defendant also "[h]ad a great deal of blood about his person, on his face and hands." Detective Reyda testified that Defendant appeared to understand all of their questions, and he was "extremely cooperative." She explained that she and Detective Treece had to slow Defendant down because "he was wanting to talk so much." Defendant signed a waiver of rights and gave a recorded statement.

On cross-examination, Detective Reyda testified that Defendant indicated during the interview that his medication was incorrect. He also talked about his childhood and his father and that what he did to the victim was what he wanted to do to his father. Detective Reyda testified that she smelled the odor of alcohol on Defendant, but she did not know his level of intoxication.

Dr. Darinka Mileusnic-Polchan performed an autopsy on the victim. She determined that the victim had gunshot wounds to his left upper chest, lower abdomen, "toward his lower back and side," and three gunshot wounds to his side. Dr. Mileusnic-Polchan testified that the victim had three major stab wounds to his lower abdomen. He also had cuts to his face, neck, and shoulder. Dr. Mileusnic-Polchan testified that the victim had a wound that she described as "mutilation" on his left chest, and a large portion of the victim's lung was removed. She received the removed portion of the lung, which had been mangled, in a separate "biohazard bag."

Dr. Francis Peter LeBuffe, Medical Director of Psychiatry at St. Mary's Hospital, testified that Defendant was his patient from 2000 to 2008. He first met Defendant when Defendant was admitted to St. Mary's for depression, mood instability, and drug and alcohol abuse. Dr. LeBuffe testified that Defendant had "been on antidepressants and mood stabilizers and usually several drugs, . . . , at a time" throughout the time that he had known Defendant. Dr. LeBuffe testified that he saw Defendant at least once a month from 2002 until 2005 at the Comprehensive Community Care, which was a clinic for individuals with "dual diagnosis: psychiatric problems and chemical dependencies." He explained that Defendant had a number of co-occurring conditions, which consisted of "a mood disorder, probably bipolar disorder; posttraumatic stress disorder [PTSD]; some cognitive disorder due to brain injuries; and chemical dependencies." Defendant was taking a number of antidepressant medications, most of which was a combination of Wellbutrin and Lexapro. He was also on mood stabilizers and antipsychotic drugs. Defendant was on Seroquel for years and on Zyprexa for a short time. He had also been prescribed Gabitril and Gabapentin.

Dr. LeBuffe noted that Defendant had a history of seeing demons and frightening apparitions, which began in childhood and continued into adulthood. Defendant would also hear voices; "sometimes threatening, sometimes it would be like just a babble of voices." Dr. LeBuffe explained that Defendant's hallucinations would "get better and worse with medication."

Dr. LeBuffe testified that Defendant appeared to have been "severely physically abused" by his father. He said that Defendant was a bed-wetter, and his father would beat him every time that he wet the bed. Defendant's father eventually made him sleep naked on the floor every night, and that is when Defendant began hallucinating. Dr. LeBuffe testified that Defendant was admitted to St. Mary's Hospital in September of 2004 for bacterial meningitis and encephalitis. He was in a coma for several days and was not expected to live at the time. Defendant eventually responded to treatment and was discharged from the hospital. Dr. LeBuffe believed that Defendant's "cognitive functions got somewhat worse." He noted that Defendant's wife committed suicide approximately nine months later. She died from an overdose of morphine and cocaine.

Dr. LeBuffe testified that Defendant was in the emergency room at St. Mary's in 2006 for stabbing himself in the heart on the anniversary of his wife's death. He was treated and released but then he was "suicidal and he wasn't stable, and he was admitted to [ ] psychiatric services about two weeks later." Dr. LeBuffe testified that he saw Defendant on February 27, 2007, for a routine visit. At the time, Defendant was taking "Wellbutrin and Lexapro, which are antidepressants; Seroquel, . . .; Gabitril, another mood stabilizer; alprazolam, which is an anxiety medicine; and he was also on some hydrocodone for pain." Dr. LeBuffe noted that Defendant was "relatively stable" at the time, but "he had some significant pressured speech," he was anxious, and had a lot of pain in his hands. He explained that Defendant had chronic pain in his hands from smashing them into a brick wall immediately after his wife died, and he suffered multiple fractures.

Dr. LeBuffe saw Defendant on June 21, 2007. Defendant's mood was relatively stable, but he complained of significant pain. He saw Defendant again on August 3, 2007. At that time, Defendant had broken a few of his toes, and Dr. Trudell, a neurologist, had suggested that Defendant go to a pain clinic, "but that had not happened." Dr. LeBuffe noted that Defendant was still drinking alcohol and using cocaine occasionally. Defendant also mentioned seeing demons. He did not modify any of Defendant's medication at the time. Dr. LeBuffe next saw Defendant on September 24, 2007. Defendant was anxious and complaining of racing thoughts. He was unable to sit still and was rocking in the chair. Defendant had discomfort and tingling in his legs and had stopped taking Seroquel, Gabitril, Lexapro, and Wellbutrin. Dr. LeBuffe urged Defendant to resume his medications and referred him to the Bearden Pain Clinic, but he did not think that Defendant went there.

Dr. LeBuffe testified that Defendant was voluntarily admitted to St. Mary's on April 21, 2008, and remained there until May 3 or 4, 2008. He noted that the average length of stay was normally four to five days. Concerning the reason for the admission, Dr. LeBuffe said:

> Again racing thoughts; inability to concentrate; auditory hallucinations. He was hearing, like, just a babble of loud voices as if there were a crowd in the room, all talking. He was having a feeling like things were crawling on him. And then he was just feeling very anxious, depressed, and he was thinking about suicide. He was let's just say ruminating about suicide. Considering suicide.

Defendant was diagnosed with "bipolar disorder, depressed type, severe with psychosis; cognitive disorder secondary to meningoencephalitis; polysubstance abuse." Defendant also had borderline intellectual functioning and a learning disability. Dr. LeBuffe noted that Defendant's medications were changed a number of times during his stay, and Dr. LeBuffe performed a 'Mini Mental State Exam" on Defendant. He said that Defendant scored a 20 out of 30 and that "[g]enerally anything less than 24 is considered significant cognitive impairment, significant loss of intellectual function."

On cross-examination, Dr. LeBuffe testified that Defendant had a history of IV drug use. He noted that the Comprehensive Community Care Clinic is primarily designed to treat people who have drug and addiction difficulties that contribute to their mental illness. He agreed that it was sometimes difficult to distinguish whether the mental illness or drug abuse came first. Dr. LeBuffe testified that when Defendant was admitted to the hospital with meningitis in September of 2004, although he was placed in medically-induced coma, the CT scan of his brain was normal, and when he was discharged the CT scan was still normal. He said that Defendant tested positive only for opiates, which he had been prescribed. Dr. LeBuffe admitted that Defendant always reported complaints of pain to him.

Dr. LeBuffe testified that when Defendant was admitted to the hospital on June 28, 2006, it was for superficial stab wounds to his chest. Medical records indicated that Defendant was intoxicated and in no real physical distress. Defendant was discharged to police custody after he refused any tests. Concerning the injury to Defendant's hands on June 29, 2005, Dr. LeBuffe agreed that Defendant had one fracture to one bone in each hand. When he saw Defendant on February 27, 2007, Defendant was still complaining of pain in his hands, and he was anxious and paranoid. Dr. LeBuffe renewed Defendant's prescription for hydrocodone at that time. He agreed that when he saw Defendant on June 21, 2007, he noted that Defendant had been calling repeatedly to request an increase in his opiates. During a visit on August 3, 2007, Defendant admitted that he had been using cocaine. At that time, Defendant talked about lifelong hallucinations, seeing demons, and for the first time in the

notes, indicated that he had to sleep on the floor and that his father beat him for wetting the bed.

On September 24, 2007, Defendant again asked Dr. LeBuffe for additional pain and nerve medication. Dr. LeBuffe testified that he urged Defendant to go to a pain clinic, but he noted that "[p]ain clinics generally will not accept individuals with his history." Dr. LeBuffe testified that when Defendant went to St. Mary's on December 4, 2007, he was again complaining of pain. He tested positive for benzodiazepines (Xanax) and opiates, which would have been from hydrocodone. Dr. LeBuffe could not tell from the drug screen whether Defendant had been taking his antidepressants. Hospital records indicated that Defendant was cooperative and appropriate, and he denied hallucinations, depression, anxiety, and being suicidal.

Dr. LeBuffe agreed that Defendant reported to St. Mary's again on April 21, 2008, and specifically requested to go to "Tower 4." He noted that he had not seen Defendant in several months and that Defendant had called in for refills on his medication several times. At the time of his admission, Defendant indicated that he was experiencing a stressful situation at home between his mother and his brother. Defendant thought that they were going to press charges against his son. Defendant also said that he was using cocaine again for pain that he was experiencing, and his drug screen was positive for cocaine, opiates, and benzodiazepines (Xanax). Although Dr. LeBuffe did not indicate that Defendant was suffering from post-traumatic stress syndrome at that time, he noted that Defendant was hallucinating. He said that Defendant was stable when he was released on May 4, 2008. Dr. LeBuffe admitted that his function was to treat Defendant's symptoms, not to determine if Defendant was "faking" anything. He admitted that cocaine and opiates could cause hallucinations, but he noted that Defendant had hallucinations before his drug abuse began. Dr. LeBuffe admitted that he was unable to distinguish whether Defendant's hallucinations were due to drug abuse or his bipolar disorder. He thought that the hallucinations were "probably more due to PTSD [posttraumatic stress disorder]." Dr. LeBuffe acknowledged that benzodiazepine abuse may cause tactile hallucinations, and it is a drug that is easily abused. He agreed that the abuse of cocaine, benzodiazepines, and opiates may cause irritability, depression, restlessness, and paranoia. Records indicated that Dr. LeBuffe gave Defendant a prescription for Soma, a muscle relaxer, after he left St. Mary's on May 4, 2008. Defendant also received a prescription for "150 hydrocodone, 650 milligrams" on June 3, 2008, which Dr. LeBuffe thought was a refill from May 4, 2008.

Dr. James Murray, a licensed clinical psychologist who practiced clinical and forensic psychology, testified that he was requested to evaluate Defendant and look at his "competency to stand trial and any factors involving mental health issues; his mental status at the time of the alleged offense." Concerning the assessment procedure, Dr. Murray testified:

-8-

I used a variety of measures, including an adult history form which basically covers an individual's history and background, and kind of incorporates mental status; things like observation of his mood and thinking, and reports of various symptoms. I used a device called the Personality Assessment Screener, which is a screening device that - that is rather quick and short, and gives you an idea . . .

Essentially it says, "Gosh, if you did a full assessment test, you're likely to get these results." I had to give that because evaluation of [Defendant] is difficult, as he is intellectually limited and had a reading level that - that is below the third grade level. So many of the standard and - and most widely utilized assessment techniques, self-report measures like the MMPI, say, require a reading level up and to the fifth, sixth, seventh grade. And it was pretty clear that - that he did not have that. And so you could not anticipate getting a valid, interpretively useful results.
. . .

I used the Wechsler Adult Intelligence Scale - III, which is kind of the - the gold - the Wechsler measures are the gold standard for intellectual assessment.

I used the repeatable Battery for the Assessment of Neuropsychological Status, which is a screening device for assessing things like attention, concentration. Just kind of some of the basic building blocks of - of thinking and cognition.

I gave him a Basic Achievement Skills Inventory screener to take a look at academic capabilities, particularly reading and language skills.

And I also gave him the San Diego Quick Assessment, which is basically a - a list of - of reading words at various grade levels to see at what grade level he could get all the words correct.

I gave him a - a test that is designed to look at optimal effort, whether a person is giving a reasonable effort on cognitive tasks. Kind of a - a validity or malingering test. I gave him the MacArthur Competence Assessment Tool - Criminal Adjudication assessment instrument. And that is basically to take a look at his - his knowledge of issues related to his legal situation, courtroom situation, the ability to work with his attorney. It also assesses his ability to kind of do some basic reasoning and apply those - those skills in making decisions in a manner that would be appropriate or necessary in the courtroom situation.

Dr. Murray testified that he evaluated Defendant at the Knox County Detention Center and performed numerous tests. He also reviewed medical records. Dr. Murray explained that due to Defendant's intellectual and reading limitations, it took some time to administer the tests, so Dr. Murray made several trips to the detention center. Dr. Murray administered an IQ test to Defendant and obtained a verbal IQ score of 66, which placed Defendant in the "extremely low range with a performance below more than 99% of the population." Dr. Murray also obtained a performance scale IQ score of 74, "which placed [Defendant] in what's called the borderline range with a performance below 99% of the population." He testified that Defendant's full-scale IQ score was 66, "which placed him in the extremely low range, again below 99% of the population or more." He said that there was a 95% degree of certainty that Defendant's actual full-scale IQ score was between 63 and 71. Dr. Murray testified that Defendant's score was in the upper end of the mentally retarded range.

Dr. Murray testified that he administered the Personality Assessment Screener (PAS) to Defendant. The results indicated that based on Defendant's scores, "approximately 99% of individuals with his PAS total score report display some type of clinically significant problem in a more comprehensive evaluation." Concerning the results of the test, Dr. Murray testified:

Well, it parked him in the category of marked risk for experiencing clinically significant problems, so that he is significantly more likely to exhibit emotional behavior problems than a typical what they call community dwelling adult. Probably means just somebody not inside a hospital.

The PAS results identified particular areas in which he is most likely to display clinically significant problems. He's especially likely to display significant or even severe problems with alcohol use or abuse or dependence. The problems are likely to be sufficiently severe that they have negatively impacted his interpersonal relations and work performance.

So what it says is alcohol use, abuse, or dependence is very likely to have been an issue for him, and it's sufficiently severe that it impacted his - his functioning in - in day-to-day - many important day-to-day life areas.

The results also suggest that he's likely to have significant problems with social interpersonal alienation. That is, he doesn't feel like he's like other people, he doesn't feel connected to other people, he doesn't feel part of other people. He's likely to feel estranged from others and believes he is not supported, and that he is often victimized by others.

It - the test results also indicate that although you can get this [sic] results from somebody who's - who doesn't normally have these problems, but is in a really bad situation triggering these reactions, the interpersonal reactions, they're more likely to result from longstanding and what we call characterological problems that are found in referring to - DMS-IV, the diagnostic manual for psychiatric disorders, Cluster B personality disorders.

Personality disorders are long-term character personality problems that are very resistant to change, that are built into the person, and that typically the person doesn't necessarily see problems; other people who have to deal with that person see them as problems.

So the kind of situations you see that in are antisocial or borderline personality disorders, people who chronically have trouble interacting with people, or schizophrenia spectrum disorders and paranoid disorders where more severe, psychotic level or strange thinking level problems may separate them from other people, make other people distance themselves and make them distrust, not feel connected to other people.

Test results also raised strong concerns about problems with suicidal thinking, acting out, or impulsive behavior, and with anxiety and depression. Also suggests he - he is at some risk for health problems that impact functioning. Raised concerns about the presence of psychotic features; that is, features indicating he has a level of disturbance where he's out of touch with reality, paranoid, might have delusions which are unrealistic beliefs, hallucinations, hearing voices or seeing visions, or mania. That is, very excitable, elevated mood and behavior. Raised concerns about issues of social withdrawal or isolation, and mild problems with anger control.

Dr. Murray testified that he gave Defendant the MacArthur Competence Assessment Tool for Criminal Adjudication. He said that Defendant performed in the minimal to no impairment range for two of the sections and in the upper lever of the mild impairment range on the third. Dr. Murray noted that Defendant "demonstrated an adequate understanding of legal procedures and the roles of courtroom participants." Defendant could also "adequately identify facts likely to be relevant to legal issues and give a basic explanation for the basis of their relevance." Dr. Murray's summary of findings in terms of Defendant's psychological testing were as follows:

[T]hat he functions intellectually with an IQ in the upper end of the intellect mentally deficient or - or mentally retarded range. That academically, at least

-11-

in verbal areas, he's functioning at the third grade or below. That he is - impairments - he has particularly severe impairments in areas of - of attention and memory: both immediate memory, that is, recalling something that was presented, and then coming back with it right away; and delayed memory, where he's got to recall it after a delay of 15 minutes or so. And then he is easily distractible.

And these are consistent with his performance in these areas where he had those particularly severe impairments in the R-bands, were below the level that you would expect simply with somebody who was, say, mentally retarded at the level he - he's showing at, and more consistent with somebody who - who has some kind of brain damage in discrete areas.

Dr. Murray's overall conclusion was that Defendant was competent to stand trial. However, he determined that Defendant had bipolar disorder, espisodically with psychotic features, polysubstance dependance, dementia, and a learning disability. Dr. Murray noted that there was not enough evidence to convince him that Defendant suffered from post-traumatic stress disorder, but he was still considering it. He ruled out mental retardation and noted that while Defendant was "functioning, by the IQ test, in the mental retardation range, it's anybody's guess if that is his actual IQ, or maybe his IQ is slightly above the mentally retarded range, and with the brain damage he's - that caused it to bounce down. I mean, you can argue it either way."

Dr. Murray testified that he when he assessed Defendant, he also relied on recordings of the negotiations between Defendant and Lieutenant Palmer, an audio recording, a video recording, a transcript of Defendant's interrogation, and a transcript of recordings or written documents from 18 witnesses who were interviewed at or after the time of the shooting. He reviewed records of previous mental health professionals which included interviews with Defendant's family that indicated a severe level of family dysfunction during Defendant's childhood. The family indicated that Defendant's father was emotionally and physically abusive to Defendant and his brothers, and Defendant's father would beat him for wetting the bed. Defendant reported major problems with substance abuse beginning in early childhood. Defendant said that he began drinking beer at age six, which continued into adolescence, and he began "huffing" paint on a daily basis at age 13 which consisted of two cans per day up until age 15 when he quit. Dr. Murray testified that Defendant's grandfather was an alcoholic, and "records identify multiple close-order relatives as having substance abuse or mental health problems, in many cases resulting in hospitalization."

Dr. Murray testified that Defendant indicated that he did poorly in school and was placed in special education classes from at least the first grade. Defendant said that he was

considered a "freak" by his classmates throughout his school days. Dr. Murray testified that Defendant began to abuse alcohol even more in his 20's, and he began using marijuana. Defendant then began having "blackout spells" and could not recall what he had done for extended periods. Defendant reported that he "would become out of control and act out in impulsive, destructive, and sometimes - destructive, and sometimes aggressive fashions with little or no recollection of what he did for an extended period." Dr. Murray testified that Defendant told him that he was experiencing severe depression and anxiety, "along with problems with thinking, and that - that substance abuse and health problems have been problems for him for an extended period." Defendant also indicated that he went "'downhill brain-wise' after suffering spinal meningitis."

Dr. Murray testified that Defendant had an outpatient forensic evaluation by Dr. Tennison in 2008. He noted that Dr. Tennison found that Defendant "had a limited recall of events around the time of the offense, and at the time of the evaluation [Defendant] appeared confused and disoriented." Dr. Murray testified that Dr. Tennison suggested that Defendant "exhibited intermittent paranoia[]; intermittent explosive behavior; intermittent hallucinations; apparent dementia, a form of brain injury; delirium, another form of brain damage or injury; and cognitive changes." Dr. Murray testified that he reviewed medical records from the sheriff's office following Defendant's incarceration, and officers sought a mental health consult on June 19, 2008. He described Defendant's behavior at the time and noted that his symptoms were seen as associated with alcohol dementia, which is brain damage due to alcohol poisoning, as well as cognitive impairment due to spinal meningitis, in addition to suspected bipolar disorder. Dr. Murray testified that Defendant was hospitalized at Middle Tennessee Mental Health Institute (MTMHI) in September of 2008 for further forensic evaluation.

Dr. Murray testified that the evaluation from the MTMHI indicated that Defendant had a history of abuse, and "noted that although he went to school into the 11th grade, he was placed in special education classes and received a series of, quote, "social promotions." He was ultimately withdrawn from school upon recommendation of the school board. Dr. Murray testified that Defendant had a history of unskilled labor jobs, and "even the simple driving jobs proved beyond his capabilities." Defendant had not been employed since 2001 and was on "Social Security insurance disability." Dr. Murray noted that Defendant was apparently "unable to take care of his own funds that his mother was established as the payee. She got the money and dispensed it."

Dr. Murray testified that during Defendant's clinical and forensic evaluation at MTMHI, he reported auditory and visual hallucinations, exhibited delusional thinking, and made threatening statements. Defendant also reported that there was another figure called "Earl" within him and that "Earl" was responsible for the offenses that occurred on June 18,

2008. Dr. Murray noted that the staff at MTMHI was uncertain whether Defendant's behavior represented actual psychosis or Defendant's efforts to fake psychosis. Dr. Murray testified that Defendant appeared anxious while in the unit at MTMHI, and he repeatedly requested additional medication for anxiety. At times, Defendant's requests for additional medication were declined because he appeared to be over medicated. Dr. Murray noted that "[i]n some instances he appeared to become more functional rapidly; on other occasions he was noted to appear confused and seen rocking in a chair." Dr. Murray testified that psychological testing of Defendant at MTMHI was complicated and "perhaps compromised by his poor reading ability, possible noncompliance, and nonstandardized testing techniques." He said that "[a]dministration of a screening device [the M-FAST test] for malingering was seen as offering support for possible symptom feigning." However, Dr. Murray was concerned about the results because no further tests for malingering were given and the instructions of the test's author were not followed. Dr. Murray noted that in Defendant's discharge summary, the psychiatrist wrote, "Other tests indicate that [Defendant] was malingering." Dr. Murray testified that while at MTMHI, Defendant was diagnosed as being bipolar.

Dr. Murray testified that he found some evidence of PTSD stress disorder with Defendant. He said:

> The medical record indicates that [Defendant] and family members have reported that he was severely abused by his father. That that included the father staging fights between the brothers, being physically assaultive, being verbally abusive to him, incidents like . . .
>
> [Defendant] was a bed-wetter for a long period of time, humiliating episodes. He had to sleep in the nude up until his early teens and couldn't sleep on a bed.
>
> So those types of experiences, violence, being forced into violent situations, intimidation, threats to one's integrity or physical well-being, that is a - a necessary condition for the diagnosis of a posttraumatic stress disorder. That you must have a - a traumatic event that - that - that severely threatens either your physical safety or your life, or your kind of basic sense of integrity.

When asked if PTSD manifested itself in Defendant's case, Mr. Murray testified: "I think there are - there's the conditions for the dynamics of a posttraumatic stress disorder." He said that a person with bipolar disorder or manic-depressive could also suffer from PTSD. Dr. Murray testified that PTSD tends to "occur when events that are experienced as similar to the original trauma occur." He further testified: "When those events occur, it retriggers the reaction in the person. There's the potential for them to relive, along a number of dimensions, the original trauma." When asked about Defendant's ability to exercise judgment and

-14-

reflection, Dr. Murray testified that it was "grossly impaired by virtue of his being off his medication, the psychotic or disorganized state he was in, and the fact that he was reliving elements of his experience with his father." Dr. Murray's reports were then admitted into evidence.

On cross-examination, Dr. Murray testified that he had access to a number of Defendant's records including hospitalization records from St. Mary's Hospital, Dr. LeBuffe's treatment records, jail records, and the records from MTMHI. He also made reference to a report from Dr. Jethandani regarding a diagnosis, which was part of the records from MTMHI. Dr. Murray agreed that the records from MTMHI included records from the Knox County Jail, and Dr. Cliff Tennison of the Helen Ross McNabb Center.

Dr. Murray testified that when he first interviewed Defendant on October 21, 2010, Defendant had already been seen at MTMHI, and he had the benefit of their evaluation and documentation from the in-depth period that Defendant was being monitored twenty-four hours a day. He said that the information was useful "[p]articularly for the establishment of a diagnosis." Dr. Murray testified that at the time of the interviews, Defendant was aware that Dr. Murray had been retained by defense counsel, and he understood that Dr. Murray was there to help with his defense.

Dr. Murray testified that Defendant told him that he had insomnia and could not sleep without pills. He said that he took Quaaludes, nerve pills, Valium, and sleeping pills. Defendant said that he could not recall the year before he was arrested and did not remember killing the victim. Dr. Murray testified that Defendant indicated that he had a pattern of doing things he was ashamed of or did not like when he was in a "blackout condition." He also noted that Defendant said, "They tell me I get real mean and violent when I black out." Dr. Murray admitted that he did not put that information in his report, and there were several other things from his notes that he did not include in his report.

Dr. Murray testified that Defendant told him that he had audio hallucinations, hearing voices chattering, and visual hallucinations that began after he had spinal meningitis. He agreed that information conflicted with what Defendant reported to Dr. LeBuffe indicating that he had lifelong hallucinations. Dr. Murray agreed that during an interview on November 30, 2010, Defendant said that he did not think it was "right" to be punished for something that was an accident. Defendant also used the word "premeditation" during the interview. Dr. Murray agreed that Defendant told him that he stopped at Friends Bar on the night of the shooting and that it was crowded with people who were drunk. Defendant indicated that he had a pistol with him because he intended to go to a pawn shop to sell it, but he stopped at the bar because it was closer. Concerning the shooting, Defendant said, "The boy that I shot went for the gun and it went off." Defendant also said that people in the bar were "screaming and

hollering," and he stood still "because [he] didn't know if [he] was shot or who was shot until . . . [the victim] fell." Defendant told Dr. Murray, "I couldn't move. The last thing I remember is feeling real afraid." Defendant expressed doubt about the credibility of the witnesses at Friends Bar because they were "all a bunch of drunks."

Dr. Murray testified that Defendant felt that a lot of his problems after the shooting, and while he was in custody, were a combination of meningitis, finding his wife dead of an overdose, and the shooting that put him over the edge for more than a year. Defendant also went over the details of what he did on the day of the shooting. Defendant said that although he had been drinking at the time he left for the bar, he could still drive. He said, "I pretty much still had my wits. I knew what I was - what was going on when I went into the bar." Defendant reiterated that the victim was killed while wrestling over the pistol. Dr. Murray again admitted that none of the above information from his notes was included in his report.

Dr. Murray testified that he considered information received from MTMHI on Defendant's social history collected by Rebecca Smith from Defendant, Defendant's mother, and his brother. Ms. Smith reported that Defendant worked as a roofer with his father and brother on and off for several years until he quit due to his father's abusive behavior. After that, Defendant began working for Knox County digging ditches and driving trucks, but he became disabled after hurting his knee on the job, and he got confused about driving instructions. He also had problems with his hip and leg. Defendant then went on Social Security disability after seeing Dr. LeBuffe. Defendant's wife was initially the payee of the check, and then his mother became payee. Ms. Smith noted that Defendant was in the process of having the check changed over to his name when the shooting occurred. Regarding Defendant's 2006 claim for disability benefits, Dr. Murray reviewed a note from Dr. Jethandani, which read: "Diagnosis of bipolar disorder mixed with major depression and generalized anxiety disorder." There was no mention of brain damage from meningitis.

Dr. Murray testified that Defendant's social history from MTMHI indicated that Defendant's mother reported that Defendant was kind, gentle, and sensitive earlier on the day of the shooting. He talked about a family reunion and then left to see his girlfriend. Defendant's mother reported that Defendant's girlfriend got upset with him over a tattoo, and he came back home with a cut on his arm. She said that Defendant appeared to be upset but not mad. He later left the house. Dr. Murray testified that Defendant's brother, Ricky Merritt, told Rebecca Smith that Defendant had past trouble with the victim and that the victim and his friends "pushed [Defendant] around at the bar." Ricky Merritt also said that Defendant had been banned from the bar because he was loud and flirtatious. Dr. Murray agreed that Mr. Merritt also told Ms. Smith that Defendant was calm when he picked Defendant up from Defendant's girlfriend's house, even though Defendant's arm was bleeding. He said that Defendant smoked a cigarette and went to his room after he arrived home and did not appear

to be particularly upset. Defendant later left the house and told his brother, "You need to stay here." Dr. Murray testified:

> And the Defendant told Ricky that he had had a feeling someone was going to jump him about two months before. And that he and [the victim] had had words on the night in question. And that he reported to Ricky that [the victim] and his friends surrounded him and they were going to jump him, and both had their hands on the gun, and the gun went off. And this is what Ricky is telling Rebecca Smith.

Dr. Murray agreed that what Ricky Merritt reported to Ms. Smith was consistent with what Defendant told him during the interview on November 30, 2010. He further agreed that nothing indicated that Defendant was in a psychotic state when he went to the bar. Again, Dr. Murray admitted that he did not include any of the above information in his report.

Dr. Murray testified that he did not include certain information in his report from Defendant's prior admissions to St. Mary's hospital. He included in his report that when Defendant was admitted on June 28, 2006, he was described as having depression, suicidal thoughts, and paranoia. He did not mention that Defendant's wound was a superficial wound to the chest. Dr. Murray also did not report that Defendant was cursing, angry, combative, and intoxicated at the time. Defendant was diagnosed with intoxication and sent back with police. Dr. Murray acknowledged that in his report, he noted that Dr. LeBuffe's treatment of Defendant during the fall of 2007 included treatment with a variety of medications for depression, psychosis, mood instability, anxiety, and chronic pain. It was also noted that Defendant was abusing cocaine episodically and using alcohol on occasion. Dr. LeBuffe further described Defendant as suffering from lifelong hallucinations, and he had experienced brain damage as a result of contracting meningitis.

Dr. Murray testified that he had reviewed Defendant's records from September of 2004 when Defendant was admitted to the hospital for meningitis. He was aware that Defendant was actually admitted to the hospital for pneumonia that had worsened to meningitis. Defendant was "ambulatory," but was very combative and "talking out of his head." Dr. Murray agreed that Defendant was sedated for the spinal tap, but records did not indicate that Defendant was ever in a comatose state. Defendant was then treated with antibiotics and released from the hospital. Dr. Murray agreed that none of the medical records indicated that Defendant was diagnosed with any sort of brain damage as a result of the meningitis.

Concerning defendant's admission to St. Mary's on April 21 - May 4, 2008, Dr. Murray noted the following in his report:

-17-

Described as having depression; suicidal thoughts; paranoia; hallucinations, including command hallucinations.

Diagnosed with acute psychosis, suicidal-homicidal ideation. Had been abusing crack cocaine. Transferred to St. Mary's psyche unit. Displayed mood instability, hallucinations, suicidal ideations. Drug screen was positive for benzodiazepines, cocaine, and opitates. He was medicated with antipsychotic mood stabilizer, antidepressant, antianxiety, and pain medications. He was noted to be alternatively agitated or oversedated. Despite the medications, he continued to have hallucinations, irritability, and racing thoughts.

Dr. Murray agreed that he went on to note Defendant's discharge notice which was bipolar disorder, severe; and polysubstance abuse. He agreed that it was similar to what he found. Dr. Murray did not place in the report that Defendant also said that he was very concerned that his mother and brother were going to have him charged with assault and placed in jail. He further agreed that the treatment notes from St. Mary's did not indicate Defendant mentioned that he had been abused by his father. Dr. Murray did not recall if he was aware that Defendant was being treated with 650 milligrams of hydrocodone in quantities of 150 per month. He knew that Defendant had problems with pain and physical difficulties. He did not recall reviewing Defendant's medical records concerning the injury to his hands.

Dr. Murray agreed that Defendant told Dr. Tennison at the jail that the victim grabbed his arm and the gun went off. However, Defendant later told staff at MTMHI that he did not recall the events of the shooting. Dr. Murray was aware that staff of MTMHI noted on a number of occasions that Defendant engaged in drug-seeking behavior. They were also concerned that he was malingering. Dr. Murray testified that the staff at MTMHI did not support any finding of PTSD with Defendant, and their records did not indicate that Defendant mentioned anything about flashing back to his abusive childhood on the night of the shooting. Although Defendant told staff at MTMHI that he had someone named "Earl" inside of him who did all of the bad things, he never mentioned "Earl" to Dr. Murray or to Captain Jeff Palmer. Dr. Murray acknowledged that Defendant did not tell Detective Heather Reyda or Detective Ray Treece that "Earl" made him kill the victim, and it did not appear from the records that Defendant made that complaint to Dr. LeBuffe, Dr. Tennison, or Dr. Jethandani. Dr. Murray agreed that the records from MTMHI reflected that Defendant told a technician "that he was damn mad at the victim, and that he cut [the victim's] body up just because, [reading] 'I just wanted him to go away. He was dead, and I was thinking my whole life is messed up.'" Dr. Murray did not include the statement in his report.

Dr. Murray admitted that what Defendant told him was entirely different than what he told Detectives Reyda and Treece. He also admitted that he had no evidence that Defendant

was in a psychotic state at the time he left the house and drove to the bar. Dr. Murray also acknowledged that during negotiations with Captain Palmer at the crime scene Defendant said:

> Listen, don't f [-]c k with me, 'cause that pisses me off more than anything, is somebody trying to f [-]c k with me. That's why I shot - that's why I shot this motherf[-]cker laying there in the floor, 'cause I kept telling him, 'Don't f[-]ck with me. Don't fool with me,' and he kept on. He didn't think I was serious, but I busted him anyway."

Dr. Murray felt that Defendant was an unreliable reporter of his own condition and the things around him.

Dr. Murray again testified that he could not say within a reasonable degree of medical certainty that Defendant was suffering from PTSD on June 18, 2008. He also could not say within a reasonable degree of medical certainty that Defendant was incapable, because of his mental disease or defect, of premeditating the victim's homicide. Dr. Murray agreed that he could not say within a reasonable degree of medical certainty that Defendant's mental disease or defect rendered him incapable of committing a knowing and intentional killing.

Dr. Murray agreed that Defendant was able to understand what Captain Palmer said to him after the shooting, and he understood that Captain Palmer was a police officer. He said that Defendant was able to talk with Captain Palmer about conditions for his surrender, and Defendant was concerned with his physical safety. Dr. Murray agreed that Defendant expressed disbelief that Captain Palmer would trust him after he had "just killed a man." During negotiations, when asked if Defendant would bring the victim to the door so that paramedics could help him, Defendant indicated that the victim was dead, and Defendant was not dragging him anywhere. Dr. Murray agreed that Defendant never told Captain Palmer anything about past abuse by his father or that he did to the victim what he wanted to do to his father.

Dr. Murray acknowledged that although he had opined that Defendant was in an "unmedicated" state at the time of the shooting, he had no way of knowing which medications Defendant had taken on the day of the shooting. He was unaware that two of Defendant's prescription bottles were found on a table in the bar and recovered by police. One of the bottles for 150 tablets of 650 milligram hydrocodone was empty and the second bottle contained Soma, a muscle relaxer. Dr. Murray was not aware that the caps to the bottles were removed and found elsewhere after Defendant was taken into custody. He agreed that he had reviewed a lot of material indicating that Defendant had engaged in "drug-seeking" behavior in the past. Dr. Murray had reviewed Defendant's jail records indicating that he told jail

personal that did not remember the night of July 18, 2008, and he denied suicidal intentions. He also complained of pain and requested pain medication. Jail personnel also indicated that Defendant appeared normal. Dr. Murray acknowledged that he made a notation from the records of Dr. Shirley Chastain who reported that Defendant told her that "in respect to being charged with this homicide, that he had it covered based upon his prior history of mental illness[.]" He agreed that jail staff reported on July 1, 2008, concerns that Defendant was engaging in manipulative behavior versus being very ill and psychotic. Dr. Murray acknowledged that he did not include any of his review of Defendant's jail records within his own report.

On redirect examination, Dr. Murray testified that he also took into consideration Dr. Chastain's reports that Defendant was experiencing severe tremors and that she diagnosed him on July 19, 2008, with "probable dementia secondary to meningitis and alcohol dependency." He also considered that Dr. Chastain placed Defendant on Haldol, Lexapro, and Seroquel. Dr. Murray also took into consideration a report that said:

> . . .[H]e was disheveled, melioidosis [phonetic], smells of urine, constantly rocking, speech clear, thought processes scrambled, off task, talks of his baby brother being a corporate officer. He talks of a big bedroom, then a middle bedroom, and a little bedroom, and lying, and trying a bow and arrow. Some responses are nonsensical. He claims he hasn't had anything to drink in three days or eat in two days.

Dr. Murray testified that he had to be cautious in taking Defendant's statements during their interview at face value. He said that Defendant had "a number of factors that could potentially make him an unreliable reporter of what's going on with him and what was going on in - in various circumstances." Dr. Murray also testified that Defendant was asked to describe what was going on when he was psychotic, and that "it's likely that - that would be distorted due to the fact he's remembering something that occurred while he was psychotic."

Dr. Murray testified that he did not have an opportunity to review Defendant's medical records at the time of his report. He said that the records indicated that Defendant was in a moderate or severe coma at some point.

*State's Rebuttal Proof*

Dr. Samuel Craddock, a retired psychologist from MTMHI and expert in the field of clinical psychology, testified that he performed a psychiatric evaluation of Defendant. The evaluation team also included Dr. Rokeya Farooque, Rebecca Smith, nurses, and nursing

supervisors that rotated during the 28 days Defendant was in MTMHI. Dr. Craddock testified that the evaluation process relied upon "everything from school records that come in; to prior hospitalizations, whether they're psychiatric or general hospitalizations; whatever medical records that we can get; as well as their prior arrest record; and interviewing people in the community that may have known the individual, family members." Dr. Craddock further testified:

> Well, of course we had the affidavit describing briefly the incident that led to his arrest. Then we had a letter from his original defense attorney; material that you have sent; as well as an interview with Mr. Merritt's mother and brother; Baptist hospital records; the Helen Ross McNabb forensic evaluation that was done before Mr. Merritt came to us; records from the University of Tennessee; St. Mary's records' and then newspaper article; the medical examiner's report. And then we also received some school records. We received Dr. Murray's evaluation. And there's probably a couple of other things that I've forgotten. But that gives you a general impression of what he had to work with.

Dr. Craddock testified that after the evaluation, it was concluded that Defendant was competent to stand trial and was not a danger to himself and others. It was also determined that he could return to jail and receive medication there instead of in a hospital. An opinion was also given to the Court as to whether an insanity defense could be supported. Dr. Craddock testified that his opinions were given within a reasonable degree of psychological certainty and Dr. Farooque's were given within a reasonable degree of medical certainty.

Dr. Craddock testified that he first attempted to administer the Personality Assessment Inventory to Defendant. Because Defendant said that he had a hearing problem and was limited in reading and spelling, Dr. Craddock read the questions, and Defendant marked his responses on an answer sheet. Dr. Craddock testified that Defendant started off well on the first part of the test, but then Defendant began changing his answers, he would skip an item or place items in the wrong column, and Dr. Craddock felt that he was sabotaging the test. Dr. Craddock then administered the Bender-Gestalt test to Defendant, which is a test used to determine if a person has brain damage. He said that Defendant did not give the characteristic errors of someone with brain damage. He said that Defendant's responses were consistent with malingering, which "is an intentional effort to give a deceptive impression of yourself." Dr. Craddock next administered the Wechsler Memory Scale Visual Reproductions test. He said that Defendant's responses to the test were not consistent with those of a brain-damaged individual and again raised the suspicion of malingering. Dr. Craddock also gave Defendant the Rey Memory and Recognition Test which demonstrated that Defendant was possibly malingering. Dr. Craddock noted that Defendant's score on the test was 1, and "scores of 20 or less are likely very suspicious of malingering." Dr. Craddock testified that he administered

the M-FAST test, "which is when somebody is malingering a mental illness more than a visual-motor deficit."

Dr. Craddock testified that there were many pieces of information used which led him to believe that Defendant was malingering. This included: "inconsistency in remembering the events that led to his arrest. He gave a number of different accounts, and that seemed unusual. Malingering is more presenting yourself in a devious fashion." Dr. Craddock also indicated that Defendant's assertion that "Earl" was responsible for the shooting was an example of malingering. He noted that previous treatment records indicated that Defendant or one of his family members had mentioned "Earl." It did not appear that Defendant mentioned "Earl" to Dr. Murray. Dr. Craddock noted that Defendant requested medication more than he thought was needed. He said:

> And at times he would rock and appear sedated and we would say, "You know, really you don't  - you don't need anymore. And look at your behavior right here, how you're appearing on the residential unit."
>
> We can observe them 24 hours a day.
>
> And then he would stop the rocking, appear more alert. . .

Dr. Craddock noted that Defendant was in the Knox County Jail prior to his admission to MTMHI. Defendant had been prescribed medication, and medication was found in his jail cell that he had not been taking.

On cross-examination, Dr. Craddock testified that Defendant "certainly seemed to be more cooperative" with Dr. Murray than with him. However, Dr. Craddock also testified that Defendant, on some test items, gave him a better response than he had given Dr. Murray. Dr. Craddock testified that it was his understanding, from information gathered from Defendant's mother, that Defendant had stopped taking his medications at the time of the shooting. He said that Dr. Farooque prescribed medication to Defendant after he was admitted to MTMHI. Dr. Craddock felt that it would have been better if he were "running the show" to observe Defendant while off his medications; however, it was Dr. Farooque's decision concerning medication. Dr. Craddock testified that he reviewed records by Dr. Lebuffe and agreed with the diagnosis of "Bipolar I Disorder, borderline intellectual functioning." Dr. Craddock was aware that the victim's autopsy report contained the following statement: "That the left lung demonstrates extensive tearing, hemorrhage, and generally very mangled, chewed tissue."

Dr. Rokeya Farooque, a forensic psychiatrist at MTMHI, testified:

First let me say that that's [Defendant]. He was admitted in my evaluation unit for 30 days inpatient forensic evaluation. We talked with him, evaluated his mental condition, received all information from outside sources, and put all the information together to give our opinion.

And our opinion at that time was that he was competent to stand trial. We did not find any basis to support [an] insanity defense. And as a friend of the court, we also determine whether they are committable or not. Means that whether they need to be in a psychiatric hospital for psychiatric treatment or not. And we determined that he doesn't have - meet the criteria for committability either.

Court then later on send[s] us one amended order to give our opinion about diminished capacity. So we again reviewed all our inform[ation], and at the end we did not find any basis . . .

Dr. Farooque testified that in her opinion, Defendant was capable of committing a premeditated murder.

Dr. Farooque testified that during Defendant's 30-day inpatient evaluation at MTMHI he was observed by her psychiatric technician and an RN. Dr. Farooque also saw and talked with him daily. He was also seen by Dr. Craddock and Ms. Smith, a social worker. Dr. Farooque testified that she gathered information from different sources for a psychiatric and forensic assessment. She reviewed information from Defendant's prior psychiatric and medical hospitalizations and outpatient information. Ms. Smith also spoke with Defendant's family members, and Dr. Farooque spoke with Defendant's mother.

Dr. Farooque testified that Defendant was diagnosed with bipolar disorder, which is a mental illness, and malingering. Dr. Farooque explained that malingering occurs when a person attempts to fake all or part of the symptoms of a mental illness. She said that a person may fake a mental illness if they have "a secondary gain." She testified:

So if a person - some of the person [sic], like no [sic] individual, they have some disease, but they're going to complain more about that disease. But they are not going to gain anything from that complaining. So we don't call that malingering because they don't have a secondary gain.

But in [Defendant's] case he has [a] first-degree murder charge. So, and he was faking more and more symptomalogy. Though he has a mental illness, but he was also faking more and more of the symptomalogy. So that's why we gave him [a] malingering diagnosis.

Dr. Farooque testified Defendant said that he did not remember the shooting. However, he also said the shooting was accidental, his hand was on the gun, and it discharged when they grabbed him. Dr. Farooque said that Defendant also mentioned that he had another violent personality named "Earl" and that his father was abusive. Defendant talked about hearing voices, but did not say that he committed the offense because of them. Dr. Farooque testified that Defendant began complaining daily about not receiving enough medication even though he appeared groggy and sedated. She further noted:

So, and also one - one time he acted confused in the unit. But then one of my elderly patient[s] was having some problem and he went to help the staff. We all appreciated that very much.

So for those kind of thing[s], his behavior and his - that they didn't match. So my - also my opinion was that he - he was malingering. Also Dr. Craddock's testing, psychological testing showed that he was malingering.

On cross-examination, Dr. Farooque testified that on one occasion, Defendant appeared groggy and sedated, and he requested additional medication. When Dr. Farooque pointed out that Defendant was unable to even talk with her, he became more alert and told her again that he needed more medication. It was her opinion that Defendant was acting as though he were groggy. Dr. Farooque testified that she listened to the CD's of Defendant's negotiations and conversations with police after the shooting. Although she listened to the CD's after preparing her reports, there was nothing in the conversations that changed her opinion of Defendant. Dr. Farooque testified that in two letters written in 2008, she stated that it would be necessary for Defendant "to take his psychiatric medication in order for his psychiatric condition to remain sufficiently stable to continue to be competent to stand trial." She explained that Defendant was on Seroquel and Lexapro when he came to her, and she continued his medication while he was at MTMHI. She also placed him on Lithium, Prozac, and Haldol. Dr. Farooque testified that when Defendant was returned to jail, he was competent to stand trial.

Dr. Farooque testified that she knew what medications Defendant had been prescribed at the time of the offense; however, she did not know what medications he had or had not been taking. Dr. Farooque was aware of Defendant's behavior both before and after the shooting, and she took that into consideration. She agreed that multiple shots and cuts to the victim with a knife had an impact on her evaluation of Defendant's mental state. She was also aware that Defendant removed a portion of the victim's lung and ate some of it. Dr. Farooque testified that although Defendant told her about his abusive father, she did not see any signs of PTSD in Defendant.

-24-

## II. Analysis

Defendant argues that the trial court erred in excluding expert testimony on the issue of his severe mental disease or defect and his ability to form the requisite intent to commit first degree murder. More specifically, he contends that the trial court erred in excluding reports by Dr. Murray concerning Defendant's ability to form specific intent at the time of the shooting. He frames his issue in the brief as follows: "Whether the admission of expert testimony requires an opinion of total negation of defendant's ability to form requisite intent or simply probative expert testimony couched in credible science, which assists the trier of fact, and meets the relevancy and expert testimony standards of the Tennessee Rules of Evidence."

In a pre-trial hearing, Dr. Murray testified that Defendant's mental disease or defect at the time of the offense was that he "had a psychotic disorder of a chronic nature, be it bipolar disorder or schizophrenia or some kind of organically based psychotic level of impairment." Although there was a possibility that Defendant had PTSD, Dr. Murray could not say within a reasonable degree of medical certainty that Defendant had the disorder on June 18, 2008. Dr. Murray agreed that he could not say within a reasonable degree of medical certainty that Defendant was incapable, due to his mental disease or defect, of premeditating the victim's murder. Likewise, he could not say that Defendant's mental disease or defect rendered Defendant incapable of committing a knowing or intentional killing.

On cross-examination, Dr. Murray testified that due to Defendant's "mental diseases or defects that his capacity to accurately perceive the reality of the circumstances of that event were grossly impaired." He further said that Defendant's judgment was grossly impaired. Upon further cross-examination, Dr. Murray testified that Defendant's "ability to reflect and exercise reasoned judgment was grossly impaired by his psychotic state and by the impact of post-traumatic stress disorder like symptomology." He said that "grossly" meant substantially or severely." After hearing arguments on the matter by both sides, the trial court ultimately concluded that testimony by Dr. Murray would be admitted at trial.

At trial, Dr. Murray testified that he was requested to evaluate Defendant and look at his "competency to stand trial and any factors involving mental health issues; his mental status at the time of the alleged offense." Dr. Murray met with Defendant several times, performed tests, reviewed his medical and mental health records, his social history, and information concerning the offense. Dr. Murray's overall conclusion was that Defendant was competent to stand trial; however, he diagnosed Defendant with bipolar disorder, espisodically with psychotic features, polysubstance dependance, dementia, and a learning disability. There was not enough evidence to convince him that Defendant suffered from PTSD. Dr. Murray noted

that Defendant was also diagnosed as bipolar by staff at MTMHI, and notes also reflected that tests indicated that Defendant was malingering.

When asked about Defendant's ability to exercise judgment and reflection at the time of the shooting, Dr. Murray testified that it was "grossly impaired by virtue of his being off his medication, the psychotic or disorganized state he was in, and the fact that he was reliving elements of his experience with his father." However, on cross-examination, Dr. Murray testified, as he did in the pretrial hearing, that he could not say within a reasonable degree of medical certainty that Defendant was suffering from PTSD at the time of the offense on June 18, 2008. Further, he could not say within a reasonable degree of medical certainty that Defendant was incapable, because of his mental disease or defect, of premeditating the victim's homicide. Dr. Murray agreed that he could not say within a reasonable degree of medical certainty that Defendant's mental disease or defect rendered him incapable of committing a knowing and intentional killing.

In a jury-out hearing, the State objected to Dr. Murray's testimony arguing that it did not indicate that Defendant's mental disease or defect rendered him incapable of "forming premeditation which is an act which is done after the exercise of reflection and judgment." The State further argued:

I wasn't effective in - in getting the Court to understand what I was trying to say. You know, Dr. LeBuffe's testimony was admissible. He's a treating physician. He - he was able to show that he had made a - a previous diagnosis' that he had prescribed certain medications that - that - you know, whatever he had to say, his evidence was - was relevant and admissible. And I never posed an objection to that.

The problem here, Your Honor please, is this expert is not saying anything that negates his ability to form the requisite mental intent for first-degree murder. And that's why it has never been admissible. Ever. This whole trial . . .

We've been here a week listening to nothing but mitigating proof which had never been permitted in a first-degree murder case in - that - that I am aware of in - in the state. And - and it's - it's wrong.

And this - this opinion, this is not a proper opinion. It is irrelevant. He's just said that he can't even say that he's got posttraumatic stress disorder. He just said. He said it Monday under oath. He affirmed in front of the Jury. He can't say that he's got that.

. . .

It's just a - it's - it's all that evidence that goes to a defendant's - what's going on in his head, his personality, his . . .

You know, it's just this sort of thing that is routinely disallowed in our courts. It's mitigation. It's why people in his condition don't get the death penalty. It's why this isn't a death case.

Defense counsel argued that "any evidence that tends to negate the existence of a culpable mental state" was relevant, and therefore, the testimony by Dr. Murray was admissible. The following exchange then took place:

THE COURT:          . . .

                    Doctor, within a reasonable degree of psychological certainty, and based upon your examination of [Defendant], your full examination of [Defendant], can you say that at the time of the commission of the offense, within a reasonable degree of psychological certainty, that the Defendant lacked the capacity to form the required mental state for this offense?

[Dr. Murray]:       If "*lacked*" means in totality -

THE COURT:          Yes, sir.

[Dr. Murray]:        - I cannot say that.

THE COURT:          Thank you, sir. That's what mister - that's what the doctor testified to on Monday as well.

[Dr. Murray]:       I cannot say that with - I cannot say that with reasonable psychological certainty.

THE COURT:          Well, that's the standard. Because you are a - you're a license[d] psychologist as opposed to a licensed medical doctor.

[Dr. Murray]:       Right. I understand.

-27-

[Defense Counsel]: Let me ask him. Based on all of that, is it your opinion that his abilities were severely impaired?

[Dr. Murray]: Yes.

[The Prosecutor]: And that's diminished capacity.

THE COURT: But that's diminished capacity.

[The Prosecutor]: And that's the difference between.

THE COURT: That's right. And I think the courts will not allow me to - that the - the opinions will not allow me to let you ask that question.

So if you want to ask what I just asked the doctor to the Jury, you may. If you do not wish to ask that question to the doctor, you can't ask about diminished capacity. That is not a defense in the state of Tennessee

The State then requested that Dr. Murray's testimony be stricken from the record, but the trial court refused and stated its reason for doing so was "[b]ecause I think the mental disease or defect is a relevant factor for the Jury to make the ultimate decision." However, the trial court determined that two addenda to Dr. Murray's report, that had been previously marked as Exhibits 186 and 187, would be excluded because they went to the "issue of diminished capacity and [do] not satisfy the whole requirements as to the opinion that can be rendered."

Our review of the trial proceedings relevant to this issue compels us to conclude that the trial court and the prosecutor misunderstood the term "diminished capacity" and thus erroneously addressed the issue. In Tennessee, the doctrine commonly referred to as diminished capacity was first recognized by this Court in 1994. *See State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). After an exhaustive review of authority from sister states and the federal circuits, this Court held that evidence, including expert testimony, on an accused's mental state, is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first degree murder case." *Id.* The supreme court summarily agreed with the holding of *Phipps* in *State v. Abrams*, 935 S.W.2d 399, 402 (Tenn.1996). However, the court did not specifically address the doctrine of diminished capacity until *State v. Hall*, 958 S.W.2d 679 (Tenn.1997). In *Hall*, the court reviewed the exclusion of expert testimony which the appellant alleged was relevant to negate the essential elements of premeditation and deliberation. *Id*. at 688-692. Similar to the

discussion in *Phipps*, the *Hall* court held that evidence of diminished capacity is not admissible to justify or excuse a crime, but instead to prove that a defendant was incapable of forming the requisite mental state, thereby resulting in a conviction of a lesser offense. *See Id.* at 692; *See also State v. Perry*, 13 S.W.3d 724, 734 (Tenn.Crim.App.1999). The court cautioned against referring to such testimony as proof of diminished capacity. *Id*. at 690. Instead such evidence should be presented to the trial court to negate the existence of the *mens rea* for the charged offense. *Id.*

The standard of admissibility of this type of evidence was succinctly coined in *State v. Hall*, 958 S.W.2d at 689:

> [T]o gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

The testimony "*must demonstrate*" that the claimed inability to form the culpable mental state was "*the product of a mental disease or defect,* not just a particular emotional state or mental condition. It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." *Id*. at 690 (emphasis added). "[A]s with most other evidentiary questions, the admissibility of expert opinion testimony is a matter which largely rests within the sound discretion of the trial court." *Id*. at 689.

In *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005), the supreme court pointed out that "'[i]t is the showing of [a] lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.'" *Faulkner*, 154 S.W.3d at 56-57 (quoting *Hall*, 958 S.W.2d at 690). In that case, the supreme court affirmed the trial court's decision to exclude expert testimony where the doctor would have testified that the defendant suffered from a reduced ability to premeditate at the time of the crime. *Id*. at 56. The supreme court held that the expert's proposed testimony did not meet the prerequisites of *Hall* because the doctor could not testify that the defendant was incapable of intentional and premeditated action.

In *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009), the supreme court clarified that "our decision in *Hall* established that the testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content

indicates that a defendant lacked the capacity to form the required mental state for an offense. . ." The Court further stated that "although our holding in *Hall* referred specifically to psychiatric evidence under the circumstances of that case, it was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" *Id*. (quoting *Hall*, 958 S.W.2d at 691).

In interpreting the supreme court's holding in *Hall and Faulkner*, this Court has held that, in order for expert testimony regarding a defendant's mental state to be admissible, there must be a showing "(1) that the defendant 'lacked the capacity' to form the culpable mental state and (2) that he lacked the capacity due to a mental disease or defect." *State v. Antonio D. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207 at *4 (Tenn. Crim. App. Nov. 1, 2006) *perm. app. denied* (Tenn. Feb. 26, 2007). In *Idellfonso-Diaz*, the defendant argued that *Hall* and *Faulkner* did not require an expert to testify that the defendant completely lacked the ability or capacity to form the mental capacity to commit the crimes and that the expert's testimony "would substantially assist the trier of fact in determining his mental state at the time of the offenses." *Id*. at *3. However, this Court agreed with the State that "because [the expert] did not testify that the appellee completely lacked the mental capacity to commit the crimes, his testimony [was] inadmissible under *Hall* and *Faulkner*." *Id*. at *4. This Court ultimately concluded: "The fact that the appellee's mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in *Hall* and *Faulkner*. Therefore, his testimony is irrelevant and inadmissible." *Id*. *See also State v. Anthony Poole*, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868, at *9 (Tenn. Crim. App. April 14, 2009) *perm. app. denied* (Tenn. Sept. 28, 2009)(citing *Hall*, 958 S.W.2d at 689-691)( "the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea").

We are of the opinion that the trial court did not abuse its discretion in excluding exhibits 186 and 187 in this case. In exhibit 186, Dr. Murray reiterated the abuse that Defendant suffered as a child by his father and Defendant's history of substance abuse. Dr. Murray noted that Defendant had been diagnosed with bipolar disorder, polysubstance abuse, cognitive impairment due to meningitis and substance abuse, anxiety disorder, learning disability, dementia, and borderline intellect. He noted that Defendant had "frequently been found to become overly psychotic when his medication regimen is disrupted or discontinued. In these instances he has exhibited hallucinations, delusions, irritability, unstable moods, explosive outbursts, and racing thoughts." Dr. Murray noted that Defendant's mother obtained Defendant's medication from his room which consisted of "Imipramine (antidepressant), Aricept (used to treat a variety of cognitive disorders), Seroquel (an antipsychotic), Gabapentin (major depressive disorder), and Lexapro (antidepressant). Dr.

Murray further noted that a pill-count indicated that Defendant was not taking most of his antipsychotic medication regularly.

Dr. Murray summarized the events that occurred at the Friends Bar both before and after the shooting, and he reviewed Defendant's interrogation by police. He felt that Defendant's behavior during his interrogation was indicative of PTSD due to the acts of abuse as described by Defendant in his medical records and during the interrogation. Dr. Murray explained how a person is affected by PTSD. He wrote that Defendant said that he had a "relapse" of his father when the victim grabbed him and began shaking him and that he "Didn't do it to him (the victim) but I wanted to do it to my "Dad." Dr. Murray concluded:

> In a psychiatric evaluation the day after the shooting he was found to be circumstantial in his thinking, preoccupied with his abuse during childhood, experiencing auditory hallucinations, and manifesting signs of brain dysfunction. He was noted to have a history of "violent rages" since his childhood, and was diagnosed with possible bipolar disorder, dementia, and alcohol dependence. Antipsychotic and mood disorder medications were prescribed. The evaluator raised concerns that [Defendant] was preparing a NGRI defense. Also of note, twelve days after the shooting, [Defendant's] preliminary court hearing had to be postponed after he reportedly yelled incoherent statements in court and disrupted the proceedings.

> The above information strongly indicates that [Defendant] experienced symptoms consistent with the reliving or "flashbacks" from the traumatic events of his childhood during the course of the events leading up to the shooting. His statements indicate that he experienced the barroom situation as a reliving of the abusive violent incidents in his childhood involving his father beating him and staging fights. The posttraumatic stress disorder symptoms he experienced appear to have played a significant role in his behavior during the charge event period by substantially diminishing his capacity to accurately perceive the immediate circumstances in a reality oriented fashion, and by triggering emotional as well as physiological reactions consistent with these past traumatic events. This emotional and physical reliving would be likely to produce in the defendant an exaggerated sense of danger, irritability, and anger. These reliving or flashback experiences were likely to be exacerbated or to induce greater influence on his functioning given his unmedicated psychotic-level psychiatric disorder in combination with his neuropsychological damage stemming from his meningitus [sic] and his life-long abuse of drugs and alcohol.

Exhibit number 187 contains only the following statement:

As a further discussion of my analysis of [Defendant], I find that because of distorted thinking and experience ([i.e.] PTSD) he could not reflect on the reality of the actual events before him and exercise a reasoned judgment based on the actual circumstances. Instead his perception of the events and his judgment were shaped by intrusive and unbidden thoughts, emotions and physical sensations triggered by the original traumatizing experiences.

Because Dr. Murray in exhibits 186 and 187 did not state that Defendant completely lacked the capacity to commit premeditated first degree murder in this case, the trial court did not abuse its discretion in excluding the evidence. The evidence in question merely indicated that Defendant's mental disease or defect impaired or reduced his capacity to form the requisite mental state and therefore, did not satisfy the two-prong requirement of *Hall* and *Faulkner*. The evidence was irrelevant and inadmissible.

Even assuming that the evidence was admissible, we note, as pointed out by the State, that much of the information contained in exhibits 186 and 187 concerning Defendant's mental state at the time of the offense was testified to by Dr. Murray and other witnesses at trial. Dr. Murray testified that he could not say within a reasonable degree of psychological certainty that Defendant was suffering from PTSD at the time of the offense on June 18, 2008. Further, he could not say within a reasonable degree of psychological certainty that Defendant was incapable, because of his mental disease or defect, of premeditating the victim's homicide. Dr. Murray also agreed that he could not say within a reasonable degree of psychological certainty that Defendant's mental disease or defect rendered him incapable of committing a knowing and intentional killing. Dr. Murray and Dr. LeBuffe both testified extensively at trial concerning Defendant's mental health and that Defendant had been diagnosed with a number of psychiatric conditions and the medications that he had been prescribed. Dr. Rokeya Farooque and Dr. Samuel Craddock, who testified for the State on rebuttal, agreed that Defendant was bipolar and had borderline intellectual functioning. The jury was aware that Defendant had not been taking his antipsychotic medication at the time of the offense, and Dr. Murray testified that Defendant's ability to exercise judgment and reflection was "grossly impaired by virtue of [Defendant] being off his medication, the psychotic or disorganized state he was in, and the fact that he was reliving elements of his experience with his father." There was also testimony concerning Defendant's history of substance abuse and the abuse that he suffered as a child. Therefore, if there was any error in not admitting exhibits 186 and 187, it would clearly be harmless. Defendant is not entitled to relief on this issue.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, JUDGE